[No. 31771. *En Banc.* May 29, 1952.]

GEORGE J. TOULOUSE, JR., *as Executor, Appellant,* v. NEW YORK LIFE INSURANCE COMPANY, *Respondent.*[1]

[1]Reported in 245 P. (2d) 205.

*George J. Toulouse, Jr.,* and *Clarence A. Lirhus,* for appellant.

*Catlett, Hartman, Jarvis & Williams,* for respondent.

HILL, J.—This appeal presents a challenge to the validity of an agreement between an insurer and an insured, where the insured, exercising one of the optional methods of settlement offered by an endowment policy on maturity of the policy, elected to leave the proceeds of the policy with the insurer, subject to withdrawal on demand, any amount remaining in the insured's possession at the insured's death to be distributed to designated third parties.

In this case the executor of the insured's estate contends that the portion of the agreement which relates to distribution to the designated third parties on the death of the insured is void as an attempted testamentary disposition in violation of the statute of wills. He sues to recover the proceeds of the policy still in the possession of the insurer.

The insurance company takes the position that the agreement between the insurer and the insured constitutes a supplementary insurance contract and is a valid third-party donee-beneficiary contract.

When this appeal was first before us, the only parties before the court were the executor of the insured and the insurance company, and we refused to consider the issue presented, it being our view that the third parties named in the contract as distributees or beneficiaries were necessary parties to the litigation. *Toulouse v. New York Life Ins. Co.,* 39 Wn. (2d) 439, 235 P. (2d) 1003. Since then all of the distributees or beneficiaries have entered into a stip-

ulation agreeing to submit the issue to this court on the record made in the superior court.

The material facts are that December 1, 1923, the New York Life Insurance Company, hereinafter called "the company," entered into a contract of insurance with Robert Sherlock, the same being a twenty-year endowment policy, No. 8 618 424. The beneficiaries named in the policy when it matured (December 1, 1943) were four nieces and a nephew of Mr. Sherlock; however, the policy was by its terms payable to Mr. Sherlock if he was alive on that date, and he therefore became entitled to the proceeds thereof.

Mr. Sherlock wrote a letter to the company, dated December 31, 1943, and headed "Re Pol No. 8 618 424," requesting "that $6000.00 of my maturity check be left with the Company under option 1," and indicating his desire that each of the four nieces and the nephew named as beneficiaries in the policy have a one-fifth interest in any amount remaining with the company at his death. Option 1 of the policy was as follows:

"The proceeds may be left with the Company subject to withdrawal in whole or in part at any time on demand in sums of not less than one hundred dollars. The Company will credit interest annually on the proceeds so left with it at such rate as it may each year declare on such funds and guarantees that the rate of interest shall never be less than three per cent."

After a statement of options 2 and 3 (with which we are not concerned) the policy provided:

"In the event of the death of a payee *any unpaid sum left with the Company under Option 1 shall be paid in one sum*; any unpaid instalments payable under Option 2, or any instalments for the fixed period of twenty years only under Option 3 which shall not then have been paid, shall be commuted at three per cent compound interest, *and unless otherwise agreed in writing shall be paid in one sum to the executors or administrators of such payee.*" (Italics ours.)

■ (We can appropriately at this point discuss an issue not raised by appellant but raised *sponte sua* by members of the court, *i.e.*, whether, under Option 1, Mr. Sherlock and

the company could agree in writing to the disposition to be made of any unpaid sum remaining in the possession of the company on his death. It seems to us that the concluding italicized phrase, beginning "and unless otherwise agreed in writing," applied to Option 1 as well as to options 2 and 3. Unless it applied to Option 1, there was nothing to indicate to whom the "unpaid sum" left with the company under that option should be paid on the death of the payee. In any event, the parties to the agreement placed their own interpretation on Option 1. If there be any ambiguity in a contract, the interpretation which the parties have placed upon it is entitled to great, if not controlling, weight in determining its meaning. *Thayer v. Brady*, 28 Wn. (2d) 767, 770, 184 P. (2d) 50, and cases there cited. And that rule is applicable to contracts of insurance. *Insurance Co. v. Dutcher*, 95 U. S. 269, 273, 24 L. Ed. 410; *Philadelphia Life Ins. Co. v. Daugherty*, 23 Tenn. App. 311, 132 S. W. (2d) 224, 226; *State ex rel. Northwestern Mut. Life Ins. Co. v. Bland*, 354 Mo. 391, 189 S. W. (2d) 542, 549, 161 A. L. R. 423. We therefore proceed with further discussion of the case on the assumption that, in making the supplementary contract hereinafter referred to, the company and Mr. Sherlock proceeded under a right given Mr. Sherlock by the original policy of insurance.)

Pursuant to Mr. Sherlock's election to leave six thousand dollars with the company under Option 1, the company issued to Mr. Sherlock a document captioned "Supplementary Contract No. 100 891," dated January 7, 1944, by the terms of which it acknowledged that it was holding and agreed

". . . to continue to hold as a part of its general funds the sum of Six Thousand and 00/100 Dollars being part of the proceeds of Policy No. 8 618 424 issued by said Company on the life of Robert Sherlock."

By that document the company further agreed to pay interest at a rate of not less than three per cent per annum; "to pay said sum with interest as aforesaid to Robert Sherlock (herein called the payee) on demand in sums of not less

than $100 each"; and to pay the unpaid balance, if any, remaining in its possession at the death of Mr. Sherlock, as follows:

"Agnes Tooley, niece, 1/5, daughter of Mary Sherlock, sister of Robert Sherlock, Dominick Sherlock, nephew, son of Dominick Sherlock, brother of Robert Sherlock 1/5, Bridget McCauley, niece, daughter of Madge Sherlock, sister of Robert Sherlock, 1/5 Bridget Sherlock, niece, daughter of Dominick Sherlock, brother of Robert Sherlock 1/5, and Margaret McCauley niece, daughter of Madge Sherlock, sister of Robert Sherlock, 1/5, if living, otherwise to the executors or administrators of said Robert Sherlock, upon receipt and approval of satisfactory evidence of their appointment and qualifications."

This document remained in Mr. Sherlock's possession, except when surrendered to have interest credited. At the time it was first forwarded to him, the company also forwarded to him for signature a form letter labeled "Form No. 1," referred to by the company and found by the trial court to be an "acceptance certificate." This letter was addressed to the company and was captioned

"Supplementary Contract No. 100 891
Re: —Policy No. 8 618 424."

In it the desire of Mr. Sherlock that the company "hold $6000.00 of the proceeds of this policy" was expressed; also, his understanding of the conditions under which the money might be withdrawn and of the manner of calculating the interest was set forth in substantially the same language as in the document of January 7, 1944, with the addition of the following significant words: "It is understood and agreed that once your Supplementary Contract has been issued no change can be made in its terms." These words, and all the rest of the body of the letter except the amount "$6000.00" in the first line and the concluding paragraph, are part of the form acceptance certificate prepared by the company. The concluding paragraph is as follows:

"I further request that in the event of my death any balance remaining in the company's possession is to be paid as follows, Agnes Tooley, niece 1/5, daughter of Mary Sher-

lock, my sister, Dominick Sherlock, nephew, son of Dominick Sherlock, my brother, 1/5, Bridget Mc Cauley, niece, daughter of Dominick Sherlock, my brother, 1/5, and Margaret Mc Cauley, niece, daughter of Madge Sherlock, my sister, 1/5, otherwise to the executors or administrators of my estate."

This form letter or acceptance certificate was dated, in ink, "1/21/1944," and was signed by Robert Sherlock and witnessed. It is stamped as having been received in the office of the company January 26, 1944.

Mr. Sherlock made no withdrawals, and the accumulated funds in the possession of the company on January 7, 1950, after Mr. Sherlock's death and before the commencement of this proceeding, amounted to $7,164.31. The executor of Mr. Sherlock's estate brought this action to recover that amount from the company.

The trial court concluded, as do we, that the original insurance policy (exhibit No. 3), supplementary contract No. 100 891 (exhibit No. 6), and the form letter or acceptance certificate of January 21, 1944 (exhibit No. 5) constitute the agreement between Mr. Sherlock and the company. (Inasmuch as one of the documents which we hold constitute the agreement between Mr. Sherlock and the company is captioned "Supplementary Contract," we will, to avoid confusion, refer to that document as "exhibit No. 6," and to the agreement between Mr. Sherlock and the company as evidenced by exhibits Nos. 3, 5 and 6 as "the supplementary insurance contract.")

In view of this holding, assignments of error Nos. 3 and 4, predicated upon the executor's contention that exhibit No. 6 alone constitutes the agreement between Mr. Sherlock and the company, are not discussed herein.

The trial court also concluded that the supplementary insurance contract is a valid agreement and that each of the five beneficiaries designated therein is entitled to one fifth of the amount in the possession of the company when Mr. Sherlock died. It therefore dismissed the action of the executor, and he prosecutes this appeal.

■ The right to take advantage of optional methods of settlement provided in an insurance policy is a valuable one and will be protected. The beneficiary (or, as in this case, the insured) acquires a vested interest in the company's performance of that part of its contract of insurance. Such an interest is in the nature of a property right. The species of property is neither money nor real property, but a contractual obligation. *Latterman v. Guardian Life Ins. Co.*, 280 N. Y. 102, 19 N. E. (2d) 978, 127 A. L. R. 450. Our insurance code specifically recognizes the right of insurance companies to make such policy settlement agreements:

"Any life insurer shall have the power to hold under agreement the proceeds of any policy issued by it, upon such terms and restrictions as to revocation by the policyholder and control by beneficiaries, and with such exemptions from the claims of creditors of beneficiaries other than the policyholder as set forth in the policy or as agreed to in writing by the insurer and the policyholder. Upon maturity of a policy in the event the policyholder has made no such agreement, the insurer shall have the power to hold the proceeds of the policy under an agreement with the beneficiaries. The insurer shall not be required to segregate funds so held but may hold them as part of its general assets." RCW 48-.23.300; *cf*. Rem. Supp. 1947, § 45.23.30.

While this statute does not specifically provide that contracts such as the one here under consideration need not comply with the statute of wills, it seems to be implied.

The validity of supplementary insurance contracts by the terms of which insurance companies distribute the proceeds of insurance policies under optional methods of settlement, where the supplementary insurance contracts have provided for payment to designated third parties of any amounts remaining in the companies' hands after the death of the payees, has seldom been passed upon by the courts. The validity of such provisions was assumed without question in *Aetna Life Ins. Co. v. Bartlett*, 53 F. Supp. 1005 (1944); *New England Mut. Life Ins. Co. v. Harvey*, 82 F. Supp. 702 (1949); *Smith v. Smith*, 172 F. (2d) 399 (1949).

In the opinion (written by Justice Augustus N. Hand) in *Mutual Ben. Life Ins. Co. v. Ellis*, 125 F. (2d) 127, 138 A. L.

R. 1478 (1942), it was recognized that such a supplementary insurance contract would be valid but, going much further, the court stated that, although the contract before it in that case was not a supplementary insurance contract, because the beneficiary of the insurance policy had accepted none of the options offered by the company, it would be upheld as a third-party donee-beneficiary contract. In that case the insurer and the beneficiary had entered into what the court described as an entirely new agreement providing for certain payments to the beneficiary during her lifetime, any amount remaining at her death to be paid to three sisters of her deceased husband. The court there said that the rights of the sisters "would not be derived from the policies or through the exercise of the options but from the new agreement." In the present case, the rights of the four nieces and the nephew in the supplementary insurance contract are derived from the original insurance policy through the exercise of Option 1.

Appellant has cited no cases and we have found none holding that supplementary insurance contracts such as the one in the present case are void, as testamentary dispositions in violation of the statute of wills. The cases on which the appellant relies deal, for the most part, with the requisites of gifts *causa mortis* and are not contract cases. Typical is the Washington case on which appellant places his principal reliance, *Decker v. Fowler*, 199 Wash. 549, 92 P. (2d) 254, 131 A. L. R. 961, which involved the ownership of government bonds. The bonds recited:

" 'THE UNITED STATES OF AMERICA, For Value Received, Promises to Pay to Mr. Charles A. Marino, Payable on Death to Mrs. May Decker.' "

The bonds at all times remained in the possession of Mr. Marino. On his death Mrs. Decker claimed them. The court held that the bonds belonged to the executor of Mr. Marino's estate since there had been no valid gift *inter vivos* or *causa mortis* to Mrs. Decker. We distinguished that case in *In re Lewis' Estate*, 2 Wn. (2d) 458, 98 P. (2d) 654, 127 A. L. R. 628, by saying:

"In that case, the only question considered was whether decedent, by taking out in his lifetime certain government bonds in which another person was made a conditional beneficiary, had made a valid gift of the proceeds of the bonds to such beneficiary. It was held that he had not, because there had been no delivery sufficient to divest the donor of his present control and dominion over the bonds."

We can agree that there was no valid gift to Mrs. Decker; however, at least two commentators on the *Decker* case reached the conclusion that there was a third-party donee-beneficiary contract, as contended by the dissenting judges. 14 Wash. L. Rev. 312; 27 Minn. L. Rev. 411. The overwhelming weight of authority is contrary to the result reached by this court in that case, and the rule there laid down has been changed by statute. RCW 11.04.230, 11.04.240; Rem. Supp. 1943, §§ 11548-60, 11548-61. The case of *Decker v. Fowler*, *supra*, is not persuasive authority on any proposition except that when the payee retains possession of such bonds, there is no gift to the person designated as the after-death payee.

██ We are not here concerned with the law of gifts, *inter vivos* or *causa mortis*; but with the question of whether or not the supplementary insurance contract between the insurance company and Mr. Sherlock confers any rights on Mr. Sherlock's nieces and nephew named therein, to whom the company promised to pay any of the proceeds of the original insurance policy (plus accumulated interest) which might be in its possession when Mr. Sherlock died. Their rights under that contract are based upon the contractual obligation of the company to do what it agreed with Mr. Sherlock it would do. Mr. Sherlock might have defeated their rights by withdrawing all the money, but he had no right under the agreement to substitute someone else in their stead as the third-party donee-beneficiary; he could make no change in exhibit No. 6, in which the insurance company's obligations were set forth. By analogy to insurance policy cases, the supplementary insurance contract gave the named nieces and nephew a vested interest (*Massachusetts Mut. Life Ins. Co. v. Bank of California*, 187 Wash. 565, 60 P. (2d) 675)—not in any specific property

or to any amount of money, but in the performance of the contract by the insurance company.

The mere fact that the death of one of the parties to a contract is designated as a contingency upon which a promise to deliver property to a third-party donee-beneficiary turns, is not alone sufficient to make such a contract a testamentary disposition and subject it to the statute of wills. *Warren v. United States*, 68 Ct. Cl. 634, certiorari denied, 281 U. S. 739, 74 L. Ed. 1154, 50 S. Ct. 346; *In re Koss' Estate*, 106 N. J. Eq. 323, 150 Atl. 360; *Autenreith v. Commissioner of Internal Revenue*, 115 F. (2d) 856; *Robinson's Women's Apparel v. Union Bank & Trust Co.*, 67 F. Supp. 395; *Mutual Ben. Life Ins. Co. v. Ellis, supra.* As was said in the last cited case and quoted with approval in *In re Howe's Estate*, 31 Cal. (2d) 395, 399, 189 P. (2d) 5, 1 A. L. R. (2d) 1171, "their right to enforce is based upon a contractual obligation and not on any interest in the property of the decedent."

Deciding, as we do, that the supplementary insurance contract between Mr. Sherlock and the company is evidenced by exhibits Nos. 3, 5 and 6 and flows from and is the result of an exercise by Mr. Sherlock of Option 1 contained in the insurance policy, and that the supplementary insurance contract, like the original contract of insurance, constitutes a valid third-party donee-beneficiary contract and is not a testamentary disposition, we conclude that the trial court's action in dismissing the complaint of the executor, appellant here, should be, and it hereby is, affirmed.

GRADY and FINLEY, JJ., concur.

OLSON, J. (concurring specially)—In my opinion, the decision of this case should rest solely upon the conclusion that the contract described by the majority is a valid third-party donee-beneficiary contract. 1 Restatement, Contracts, 151, § 133 (1) (a). The insurance company is the promisor, and the deceased is the promisee, for the benefit of named third parties. The fact that such a contract is conditional, as in this case in which the promisee could have withdrawn the funds, does not render it invalid. The rights of the

donee-beneficiaries under it are subject to that limitation. 1 Restatement, Contracts, 156, 165, §§ 134, 140. The conditional event not having occurred, the beneficiaries are entitled to the funds under the contract.

HAMLEY, J., concurs with OLSON, J.

DONWORTH, J. (dissenting)—The majority opinion sanctions, for the first time in this state, a transaction whereby one person deposits money with another upon an agreement that the depositor may withdraw during his lifetime all or any part of the money so deposited and that the depositary will upon his death pay any balance then remaining to certain designated parties. This transaction is upheld upon the ground that it is based upon a contract of life insurance. In my opinion, the supplementary contract here involved is not in any way connected with life insurance and is an attempt to circumvent the statute of wills and constitutes an invalid testamentary disposition. The far-reaching consequences of the majority opinion impel me to register my dissent.

The endowment policy issued to Mr. Sherlock matured December 1, 1943, while he was still living. By its terms the company obligated itself to pay him on that date (if then living) the sum of five thousand dollars (plus accrued dividends not previously withdrawn). The optional methods of settlement included the following:

"Option 1—The proceeds may be left with the Company subject to withdrawal in whole or in part at any time on demand in sums of not less than one hundred dollars. The Company will credit interest annually on the proceeds so left with it at such rate as it may each year declare on such funds and guarantees that the rate of interest shall never be less than three per cent."

After describing options 2 and 3 (with which we are not concerned), the policy provided:

*"In the event of the death of a payee any unpaid sum left with the Company under Option 1 shall be paid in one sum;* any unpaid instalments payable under Option 2, or any instalments for the fixed period of twenty years only under Option 3 which shall not then have been paid, shall be com-

muted at three per cent compound interest, and unless otherwise agreed in writing shall be paid in one sum to the executors or administrators of such payee." (Italics mine.)

The majority opinion interprets the italicized portion of the quoted provision as being modified by the phrase "unless otherwise agreed in writing," which appears in the latter part thereof. In my opinion, the provision is not ambiguous in any degree and is not susceptible to the interpretation placed upon it by the majority, which seems to me to be a strained and unreasonable interpretation.

Had the life insurance company in drafting this policy intended that the phrase "unless otherwise agreed in writing" apply to Option 1, it would not have placed a semicolon after the words "shall be paid in one sum" appearing in the first part of the provision. We have confessed, in the recent case of *Peters v. Watson Co., ante* p. 121, 241 P. (2d) 441, to a very high regard, in interpretation of a contract, for the position of a comma. A semicolon, it appears to me, is entitled to at least the same regard in interpreting a provision as free from ambiguity as the one under consideration here.

We also, in the *Peters* case, recognized and applied, without stating it in so many words, the rule that, unless the intention of the parties appears to be otherwise, a relative word or phrase will be interpreted as referring to, or modifying, only its nearest antecedent.

Option 1 does not purport to give Mr. Sherlock any right to name beneficiaries to receive at his death any balance of the proceeds left with the company under that option. Since no right to designate any person or persons to whom such payment should be made was reserved to Mr. Sherlock in the endowment policy, the intention of the parties must have been that such proceeds were to be paid to his legal representative. It is the statutory duty of an executor or administrator to collect all debts due the deceased (Rem. Rev. Stat., § 1517) which, in this case, would include any balance remaining in the fund upon Mr. Sherlock's death.

By his letter of December 31, 1943, Mr. Sherlock re-

quested the company to retain a portion of the proceeds under Option 1 and requested that payment thereof be made (presumably at his death) to five named nephews and nieces.

On January 21, 1944, he signed a letter addressed to the company (evidently prepared for his signature by its agent) referring to a certain supplementary contract which was dated January 7, 1944, but which evidently had not been delivered to him. This letter stated in detail certain conditions as to the manner of exercising the right of withdrawal and also specified the method of computing interest on the deposit. It concluded as follows:

"It is understood and agreed that once your Supplementary Contract has been issued no change can be made in its terms.

"I further request that in the event of my death any balance remaining in the company's possession is to be paid as follows [Here are listed the names of the five nephews and nieces.] otherwise to the executors or administrators of my estate."

The supplementary contract referred to in this letter made no reference to its irrevocability. It contained the following provision:

"If at the death of said payee there shall remain any unpaid balance to the credit of said account, the amount of said balance remaining in the Company's possession shall be payable in one sum, upon receipt of due proof of the death of the payee and surrender of this agreement, to as follows [Here are listed the names of the five nephews and nieces.] if living, otherwise to the executors or administrators of said Robert Sherlock. . . .

"This agreement is not negotiable nor assignable and must be submitted with each demand for any part of said sum for proper entry herein, and shall be surrendered to the Company whenever the sum so held is paid in full. All payments hereunder are payable at the Home Office of the Company in the City and State of New York."

It is very plain to me that this so-called supplementary contract is an entirely new contract between the parties which is not supplementary to, nor in anywise connected

with, Option 1 of the endowment policy in so far as it purports to designate substitute payees upon Mr. Sherlock's death. There is nothing in the endowment policy relating to the payment of the proceeds to any person other than Mr. Sherlock *after the close of the endowment period.*

When the endowment policy matured by the lapse of twenty years on December 1, 1943, Mr. Sherlock was alive and the proceeds were payable solely to him. Under Option 1 he could and did elect to leave a portion of the proceeds with the company, but the endowment policy (as I construe it) gave him no right to designate to whom the proceeds should be paid at his death.

This supplementary contract is a new contract having nothing whatever to do with life insurance. The fact that the depositary of the proceeds was a life insurance company is immaterial. It might have been a bank or an individual. A deposit in a bank with instructions to pay any balance remaining at the depositor's death to certain designated beneficiaries would clearly, in my opinion, be void as an attempt at testamentary disposition.

The majority appear to hold that the supplementary contract was a third party donee-beneficiary contract by which the nieces and nephew acquired a vested interest in the fund during Mr. Sherlock's lifetime. The supplementary contract reserved to Mr. Sherlock the right to withdraw and use any or all of the principal and/or accrued interest during his lifetime as he should see fit. Furthermore, any creditors of Mr. Sherlock could have reached this money by garnishment or otherwise. He had not parted with any incidents of ownership in, nor control over, the money. The interests of the nieces and nephew in this deposit cannot be considered as having vested at any time prior to Mr. Sherlock's death.

The majority, in support of their conclusion that the nieces and nephew of Mr. Sherlock acquired vested interests under the supplementary contract, attempt to draw an analogy between the interest of a beneficiary under a life insurance contract wherein the insured has surrendered his

right to change the beneficiary, and the interests of the nieces and nephew under this contract, which was issued pursuant to an agreement that "no change can be made in its terms."

There can be no question that the interest of a beneficiary under a contract of life insurance wherein the insured has surrendered, or has failed to retain, his right to change the beneficiary is a vested one. In such event the beneficiary takes a vested interest which cannot be impaired or extinguished by the acts of the insured. 2 Appleman, Insurance Law and Practice, 310, § 911. But here Mr. Sherlock expressly reserved the right to extinguish the alleged interests of the named nieces and nephew by withdrawing all of the fund at any time. The rule is that if an insured retains the power to extinguish the rights or interest of a beneficiary, even though he cannot change his designation of the beneficiary, then the beneficiary has a mere expectancy or contingent interest. 2 Appleman, Insurance Law and Practice, 311, § 911.

It cannot, therefore, be maintained that even by analogy to the law of life insurance the named nieces and nephew acquired at any time prior to Mr. Sherlock's death vested rights to the balance of the fund.

The majority opinion cites, in support of its holding, the decision of the circuit court of appeals (2d Cir.) in *Mutual Benefit Life Ins. Co. v. Ellis*, 125 F. (2d) 127 (1942), which upheld a similar contract. The court in that case applied what it conceived to be the applicable law of Colorado because the policies involved were payable there.

The basis upon which that case was decided (if such ever was the law in Colorado) has been swept away by the recent decision of the supreme court of Colorado in *Urbancich v. Jersin*, 123 Colo. 88, 226 P. (2d) 316, which was decided in December, 1950. There the deceased (one Novak) and the defendant opened joint accounts in two banks in which the deceased made all the deposits. It was agreed between them that during Novak's life the defendant should have no right to withdraw any funds. It was further

agreed that upon Novak's death the defendant should withdraw the entire balance and send it to Novak's nieces and nephews. This arrangement was held to be an abortive attempt to make a testamentary disposition of the money without compliance with the statute of wills. The supreme court also held that the arrangement did not constitute an *inter vivos* gift to the nieces and nephews because the deceased did not surrender dominion and control over the money during his lifetime.

The court made it clear that it would not countenance such a contract as was involved in the *Ellis* case, *supra*, when it said:

"The money in question belonged to Novak at the time the joint accounts were created. There is no claim that defendant contributed in any way to the fund. It is undisputed that at the time the joint accounts were created, Novak and defendant expressly agreed that *upon Novak's death* defendant would withdraw the money and send it to Novak's nieces and nephews. These nieces and nephews were the sole beneficiaries named in Novak's will, which was attested prior to the arrangement with defendant. The sole purpose of the transaction resulting in the creation of the joint accounts, was to avoid the probate of the will.

"The agreement between Novak and defendant vested no interest whatever in the nieces and nephews of Novak upon creation of the joint accounts. There was no gift inter vivos. The gifts, channeled through the defendant by the agreement, were to take effect *only upon Novak's death*. Novak kept complete and unrestricted control over all the money so long as he lived, and could have withdrawn all of it and made disposition thereof in any manner he desired. Under the agreement, defendant had no right whatever to withdraw any of the money for any purpose during the lifetime of Novak, and upon Novak's death he could only do so for the purpose of transmittal to the nieces and nephews.

"We are fully satisfied that the transaction from the beginning was an abortive attempt to make a testamentary disposition of property without compliance with the statutory law which governs such transactions. It is fundamental that any testamentary disposition of property made otherwise than by compliance with the statute, section 39, chapter 176, '35 C. S. A., cannot be enforced, and gives rise to no enforceable rights whatever."

The Colorado court then cited with approval its recent decision in *Johnson v. Hilliard,* 113 Colo. 548, 160 P. (2d) 386.

The following cases are in accord with the Colorado cases above cited: *Turpin's Administrator v. Stringer,* 228 Ky. 32, 14 S. W. (2d) 189; *Johnson v. Savings Inv. & Trust Co.,* 110 N. J. Eq. 466, 160 Atl. 371; *Trenouth v. Mulroney,* 124 Mont. 499, 227 P. (2d) 590.

The result of the majority opinion will be to permit a contract between a bank and its depositor to the effect that, if the depositor dies before his account is closed, the bank shall pay the balance to X, Y and Z.

In *Stevenson v. Earl,* 65 N. J. Eq. 721, 55 Atl. 1091, a husband had a savings account in which he had made periodic deposits and withdrawals. He delivered the pass book to his wife, stating that if he should die the money in the account should go to her. The court held that there was no gift *inter vivos* because he had no intention of parting with complete dominion and control over the money during his lifetime but that it was an attempt to transfer the savings account to his wife at his death. In holding that this arrangement violated the statute of wills, the court stated:

"But, in order to legalize such a gift, there must be not only a donative intention, but also, in conjunction with it, a complete stripping of the donor of all dominion or control over the thing given. *Cook v. Lum,* 26 Vr. 375, 376. As was said in the case cited, this is the crucial test, and if it be applied to the present case the gift is not to be sustained; *for, neither by force of his contract with the company nor by the delivery of the pass-book, did he intend to, nor did he in fact, part with his complete dominion over any part of the moneys deposited by him.*

"The expressed intention of the deceased was only to bestow upon his wife so much of his deposit as should remain undrawn by him at his death. Such a gift, it seems to us, is purely testamentary in its character. If it is not, then it is a perfectly easy thing for a person to retain the absolute control and dominion over his moneys and personal securities during his life and transfer that dominion to another at his death, with total disregard of the requirements contained in the statute of wills, by the simple device of

depositing such moneys and securities, under an agreement with the depositary that he shall have the right to use them or deal with them as he pleases during his life, and that at his death so much of them as may remain shall be delivered to such person as is named in the agreement, who shall then become the owner thereof, and then delivering the agreement to the beneficiary with a statement of the same purport as that made by the deceased to his wife when he gave the pass-book to her. To hold that such a method of disposing of property by the owner at his death is valid, *would be to practically repeal the statute of wills in its operation upon personal property,* so far as its mandatory provisions are concerned." (Italics mine.)

I think that the principles enunciated in this decision and in those referred to above are applicable to the case at bar and that, since Mr. Sherlock retained possession of the supplementary contract and control over the funds during his lifetime, no interest therein vested in his nieces and nephew. Their claim to the money could only arise *by reason of his death* and, not being based upon his will, nothing was transmitted to them by the supplementary contract.

Let us examine the nature of a third party donee-beneficiary contract. The very word "donee" connotes a gift. A third party donee-beneficiary contract is one means of effecting a gift. It cannot be used as a vehicle for passing property at death, without regard for the requirements of the statute of wills. There is no authority, to my knowledge, which attempts to divorce such type contracts from all other fields of law, or which holds that they shall be given effect regardless of whether or not a contract interest vests during the lifetime of the donor.

It is fundamental that a valid gift *inter vivos* can be completed by delivery to another person for the benefit of the donee. But it is equally fundamental that in such a case the donor must irrevocably divest himself of dominion and control over the subject matter of the gift. In the present case, Mr. Sherlock expressly retained control and dominion over the funds during his lifetime, and the transaction must, then, fail both as an abortive attempt to make a gift *inter*

*vivos* as well as an abortive attempt to make a testamentary disposition of the funds.

By the decision in this case, it is held .for the first time .that the owner of personal property may avoid probate proceedings and the expense of administering his estate by the simple expedient of reducing his assets to cash and entering into a contract with a bank, insurance company or individual (similar in form to the supplementary contract here involved), while still retaining control over the money during his lifetime.

If such a revolutionary change is to be made in this state in the method of transmitting property at death, which has heretofore been recognized as exclusive, only the legislature should make it effective. It surely did not amend or repeal the statute of wills by enacting the section of the insurance code (RCW 48.23.300) which is quoted in the majority opinion.

I think that the judgment should be reversed with instructions to direct the payment of this money to appellant as executor of Mr. Sherlock's estate.

SCHWELLENBACH, C. J., and WEAVER, J., concur with DONWORTH, J.

MALLERY, J. (dissenting)—I concur with Judge Donworth, but desire to add the following: The majority opinion rests on the proposition that "the rights of the four nieces and the nephew in the supplementary *insurance* contract are derived from the original insurance policy through the exercise of Option 1." (Italics mine.)

This premise is unsound. No present rights reach back of the supplementary contract. The original insurance policy was fully executed. It has no significance now, other than being merely the consideration for the option.

The supplementary contract is not a contract of *insurance* within the purview of RCW 48.01.040, which reads:

" 'Insurance' defined. Insurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon *determinable contingencies*." (Italics mine.)

The existence of a *determinable contingency* in the supplemental contract is negatived by the right to withdraw any or all of the "deposit" at will. Since the supplementary contract is not insurance, the insurance code does not apply to the exclusion of the probate code.

September 23, 1952. Petition for rehearing denied.

